## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **RICKEY WESLEY, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF ALL OTHERS** | § | |
| **SIMILARLY SITUATED,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:18-cv-0005-ALM** |
| | § | |
| **EXPERIAN INFORMATION** | § | |
| **SOLUTIONS, INC.** | § | |
| | § | |
| **Defendant.** | § | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Paul E. Hash
State Bar No. 09198020
Paul.Hash@jacksonlewis.com
Wendy Wilkins
Texas Bar No. 24095715
Wendy.Wilkins@jacksonlewis.com
JACKSON LEWIS P.C
500 N. Akard, Suite 2500
Dallas, Texas  75201
PH:  (214) 520-2400
FX:  (214) 520-2008

**ATTORNEYS FOR DEFENDANT**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................... iv

I.      STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT...........................1

II.     NATURE OF THE CASE AND SUMMARY OF THE ARGUMENT ............................1

III.    PROCEDURAL HISTORY...............................................................................................2

IV.     STATEMENT OF THE UNDISPUTED MATERIAL FACTS.........................................3

       A.  Plaintiffs' Claims and the Relevant Time Period..................................................3

       B.  Summary of Experian's Business and Employee Payment Policies...........................3

       C.  Plaintiff James Shelton's Employment with Experian...................................................6

       D.  Plaintiff Rickey Wesley's Employment with Experian .................................................6

       E.  Plaintiff Francisco Lugo's Employment with Experian .................................................8

       F.  Plaintiff Ihor Nakonecznyj's Employment with Experian ..........................................10

       G.  Plaintiff Jennifer Dodson's Employment with Experian .............................................11

       H.  Plaintiff Joseph O'Connor's Employment with Experian ...........................................13

       I.  Plaintiff Ryan Stephen's Employment with Experian...................................................15

       J.  Plaintiff Kevin Phan's Employment with Experian .....................................................17

       K.  David Dell's Employment with Experian.....................................................................19

V.      SUMMARY JUDGMENT STANDARD ........................................................................20

VI.     ARGUMENT AND AUTHORITIES...............................................................................21

       A.   Plaintiff James Shelton's Claim Is Time-Barred and Should be Dismissed...............21

       B.  Plaintiffs' Time Spent On-Call is Not Compensable....................................................22

            1.  Location and Response-Time Restrictions ........................................................24

2.  Activities in Which Plaintiffs Could Engage........................................................26

3.  Flexibility in Scheduling....................................................................................28

4.  Frequency of Calls.............................................................................................29

C.  Any Claim for Time that Plaintiffs Dodson and O'Connor Did Not Record
Should Be Dismissed.................................................................................................30

VII.    CONCLUSION AND RELIEF SOUGHT .......................................................................31

CERTIFICATE OF SERVICE ......................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*,
  271 F.3d 624 (5th Cir. 2001) ..................................................................20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................20

*Armour & Co. v. Wantock*,
  323 U.S. 126 (1944)................................................................................22

*Bright v. Hous. Nw. Med. Ctr., Inc.*,
  934 F.2d 671 (5th Cir. 1991) ......................................................... *passim*

*Brock v. El Paso Natural Gas Co.*,
  826 F.2d 369 (5th Cir. 1987) .............................................23, 24, 26, 28

*Driscoll v. Fannin Cty.*,
  No. 4:12CV24, 2013 U.S. Dist. LEXIS 23181 (E.D. Tex. Jan. 4, 2013) ........................23, 26

*Halferty v. Pulse Drug Co., Inc.*,
  821 F.2d 261 (5th Cir. 1987), *modified on other grounds*, 826 F.2d 2 (5th Cir.
  1987) ......................................................................................................21

*Halferty v. Pulse Drug Co., Inc.*,
  864 F.2d 1185 (5th Cir. 1989) ...........................................23, 24, 26

*Hendrix v. Yazoo City*,
  911 F.2d 1102 (5th Cir. 1990) ..............................................................21

*Kelly v. Hines-Rinaldi Funeral Home, Inc.*,
  847 F.2d 147 (4th Cir. 1988) ................................................................25

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988)................................................................................21

*Mem'l Hospice, Inc. v. Norris*,
  No. 2:08-CV-48-B-A, 2009 U.S. Dist. LEXIS 13899 (N.D. Miss. Feb. 24,
  2009) ......................................................................................................23

*Nelson v. Am. Standard, Inc.*,
  No. 2:07-CV-10-TJW-CE, 2009 U.S. Dist. LEXIS 113448 (E.D. Tex. Dec. 4,
  2009) ......................................................................................................21

*Newton v. City of Henderson*,
47 F.3d 746 (5th Cir. 1995) ...................................................................31

*Paniagua v. City of Galveston, Tex.*,
995 F.2d 1310 (5th Cir. 1993) ........................................................23, 24

*Rousseau v. Teledyne Movible Offshore, Inc.*,
805 F.2d 1245 (5th Cir. 1986) ........................................................25, 26

*Royal v. CCC & R Tres Arboles, L.L.C.*,
736 F.3d 396 (5th Cir. 2013) ...............................................................20

*Rutlin v. Prime Succession, Inc.*,
220 F.3d 737 (6th Cir. 2000) ...............................................................24

*Senegal v. Fairfield Indus.*,
No. H-16-2113, 2018 U.S. Dist. LEXIS 198209 (S.D. Tex. Nov. 21, 2018) .........................21

*Sims v. Hous. Auth. of the City of El Paso*,
No. EP-10-CV-109-KC, 2011 U.S. Dist. LEXIS 98809 (W.D. Tex. Sept. 1, 2011) ...................................................................24, 28

**Statutes**                                                             **Page(s)**

29 C.F.R. § 785.17 ...............................................................22, 23

29 U.S.C. § 207(a)(1) ...............................................................22

29 U.S.C. § 255 ...............................................................21

FED. R. CIV. P. 56(a) ...............................................................20

Fair Labor Standards Act Section 216, 29 U.S.C. § 101, et seq. ...................................................................2

**Secondary Authority**

United States Dep't of Labor, Wage & Hour Dic., Opinion Letters – Fair Labor Standards Act, No. FLSA2008-14NA, 2008 DOL WH LEXIS 38 (Dec. 18, 2008)...............22, 24

Defendant Experian Information Solutions, Inc. ("Experian") moves the Court to grant summary judgment on all of the claims asserted in Plaintiff Rickey Wesley's ("Wesley") Original Complaint.

## I.   STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT

This Motion presents the following issues to be decided by the Court:

1.      Under the FLSA, can Plaintiffs establish their claim for unpaid overtime when the time they spent waiting to engage in work while on call was used to engage personal pursuits such as eating, sleeping, watching television, cooking, reading, and shopping, among other things.

2.      Under the FLSA, is Experian obligated to pay for unrecorded overtime for remote employees when Experian had an express policy obligating its IT employees to record all hours worked.

## II.   NATURE OF THE CASE AND SUMMARY OF THE ARGUMENT

This is a dispute about time spent waiting to engage in work while hourly employees were on call after their regularly scheduled work hours. Wesley brought claims on behalf of himself and other employees similarly situated alleging that Experian's on-call policy violated the FLSA because its hourly employees who were required to have on-call duties should have been paid for all the time spent on call and waiting to receive a call, even if no call ever arose. Because the representative plaintiffs were all able to use their on-call time for their own personal pursuits, this time is not compensable under the FLSA.

Summary judgment on the Plaintiffs' claims is proper because Plaintiffs' time spent on call waiting to receive a call was used for the Plaintiffs' benefit instead of Experian's benefit. The Plaintiffs' testimony proves that they were able to engage in personal activities while on call, but not responding to calls, such as watching television, eating, sleeping, visiting with friends and

family, doing household chores, going for walks, or playing with their children.

For the reasons set forth above and detailed below, Experian requests that the Court enter summary judgment in its favor on the Plaintiffs' Complaint and dismiss the lawsuit with prejudice as to all Plaintiffs.

### III.      PROCEDURAL HISTORY

This lawsuit concerns a collective action arising under Section 216 of the Fair Labor Standards Act, 29 U.S.C. § 101, et seq. ("FLSA"). The named Plaintiff, Rickey Wesley, initiated the lawsuit on January 4, 2018, alleging that Defendant violated the FLSA by failing to pay him for time spent on call after regularly scheduled work hours but not responding to calls. Wesley filed his First Stage Motion for Notice to Potential Plaintiffs ("First Stage Motion") on April 17, 2018.  Doc. 11.  The Court granted Plaintiff's First Stage Motion on June 25, 2018, conditionally certifying Plaintiff's class. See Doc. #24, Order. After notices were sent out, 21 individuals filed notices opting into the lawsuit. See Docs. #4, 26–33. On February 26, 2020, the Court granted the Parties' Joint Motion to Consolidate Civil Action No. 4:19-cv-83 with this case, bringing the total plaintiffs in the combined cases to 24 plaintiffs. Doc.#39

On February 26, 2020, the Court issued its Phase II Case Management Plan and Scheduling Order. Doc. #38. On October 13, 2020, the Court ordered that discovery should proceed under representative discovery. Doc. #44. Defendant deposed the named Plaintiffs, Rickey Wesley and Ihor Nakonecznyj, as well as Francisco Lugo, Jennifer Dodson, Joseph O'Connor, Ryan Stephens, Kevin Phan, and David Dell (collectively, "Representative Plaintiffs"). Experian now moves to dismiss the claims of all Plaintiffs based on the evidence provided by the Representative Plaintiffs.

## IV.    STATEMENT OF THE UNDISPUTED MATERIAL FACTS

The deposition excerpts, exhibits, and sworn declarations relied upon by Experian and referenced herein are contemporaneously submitted to the Court as part of Experian's Appendix in Support of its Motion for Summary Judgment.[1]

### A.  Plaintiffs' Claims and the Relevant Time Period.

Plaintiff Wesley's Complaint alleges generally that Experian violated the FLSA by not paying overtime for weeks in which employees worked in excess of 40 hours. Specifically, however, Plaintiff claims that Experian did so by failing "to properly enforce and comply with its own companywide 'On call' and 'Standby' policies that applied to all US-based non-exempt employees until late 2017." Doc.#2, Plf's Complaint at 1. In other words, Plaintiff alleges that Experian did not pay its employees who worked on-call duties and were more readily available than the "on-call" expectations for all of the time spent waiting to receive a call, and that this is a violation of the FLSA.

### B.  Summary of Experian's Business and Employee Payment Policies.

Experian is an information technology company that offers consumer and business credit reporting and marketing services to individual consumers and businesses. Certain Experian employees have specialized technical knowledge and skills that are used to assist in the security and efficiency of the data managed by Experian. Because these global security and data systems are needed at all times, some of Experian's employees are required to be available for emergency calls after regularly scheduled work hours.

---

[1] Citations in the form "App." followed by a number refer to the consecutively paginated pages of the accompanying appendix.

Experian's Human Resources policies, including timekeeping and payment polices, are available to all employees on the Experian intranet. Experian employees are responsible for keeping track of and accurately entering their "time actually worked" into Experian's Oracle E-Business Suite, which contains the company's timekeeping record system. (App. 002, Rizvan Decl. at ¶ 6). The policy defines "time worked" as "any time you spend on work-related duties, including but not limited to reviewing and responding to work-related emails and voicemails, reviewing company information, and logging in and off your computer." (App. 005, Ex. A-1, Pay Practices Policy at ¶3.9). Experian's pay practices policy also states that non-exempt employees will receive one and one-half times their regular rate of pay for all hours worked in a workweek in excess of 40 hours. (App. 003, Ex. A-1, Pay Practices Policy at ¶ 3.3). Most Plaintiffs testified that they were familiar with or had access to the Human Resources policies. (Apps. 018-19, 055, 136, 175, 218, 256, 287, 295-96, Wesley Depo. at 29:17–30:6; Lugo Depo. at 32:3–32:6; Dodson Depo. at 24:1–24:9; O'Connor Depo. at 31:5–31:18; Stephens Depo. at 54:5–54:16; Phan Depo. at 26:11–26:21; Dell Depo. at 30:10–31:5). Only Plaintiff Nakonecznyj stated that he could not recall reading the policies. (App. 096, Nakonecznyj Depo. at 39:1–39:14).

Experian's on-call, standby, and call-back policy was revised in October 1, 2017. (App. 002, Rizvan Decl. at ¶ 7). Experian's policy regarding expectations for employees while on call **before** October 1, 2017 stated as follows:

> **3.2 Expectations**
> While on-call, you are expected to respond to a page or telephone call within 30 minutes. You must call the appropriate manager and reach agreement regarding your estimated time of arrival or time you expect to be able to begin work, based upon your current location and any activities in which you may be engaged. In general, it is the goal to begin work on the problem in approximately one hour, measured from the time of your response to the page. Individual departments may implement specific on-call programs designed to meet their business needs.

Experian understands that you may or may not be able to meet the one-hour guideline and that, if you reasonably request more time to complete a personal pursuit in which you are engaged, your request will be granted. However, if you are contacted, you cannot decline to provide the requested assistance altogether. You will be expected to respond within a reasonable period of time by addressing the problem over the telephone, by connecting to work on a computer, or by reporting to the work site. You are expected to comply with Experian's Drug Free Workplace policy while performing such work.

You will have no restrictions on your time or activities beyond these basic guidelines, other than to remain in an area where you can receive messages by page or telephone and within a reasonable distance from work.

**4. Pay for on call, standby and call-back time**
You will be paid for all hours worked whether you do so by responding to a question over the telephone, addressing a problem by computer from home or other location, or by reporting to the work site. You will receive straight time, time and one-half, or double time as required by the state in which you work. You will receive at least the minimum payment as required by applicable state law. <u>There is no pay for on-call time if you receive no page or call for help.</u>

**4.3 Standby**
If, because of critical business needs, you are required to be more immediately available to begin work than the on-call standards, these hours would be considered standby time and you will receive your regular or overtime rate of pay for all standby time.

(App. 006-007, Ex. A-2, On-call Policy. (01/01/2009) at 1–2) (emphasis added).

Most Plaintiffs did not differentiate between on-call time and standby time, and they referred to all the time spent being available for emergency calls after their regularly scheduled hours as "on-call" time. For example, David Dell ("Dell") testified as follows

Q:  Do you have an understanding of what standby time was at all?

A:  I mean, I – I understand what it is.

Q:  Okay. Explain to me what standby time is, what your understanding of what standby time is.

A:  Well, you're – basically you have to make yourself available should they need you anytime.

Q:  Okay. And so what is your understanding of on-call time?

> A:       It was the same.

(App. 300, Dell Depo. at 39:7–39:16). Although Plaintiffs' claims focus on the fact that the Standby Policy stated that an employee would be paid for the entire time if he or she was required to be more readily available than the on-call expectations, all Plaintiffs testified that they understood their duties to always be considered "on-call" time. (*See*, *e.g.*, App.147-49, 300 Dodson Depo. at 49:5–51:7; Dell Depo. at 39:2–39:20).

The On-call, Standby, and Call-back Policy was revised on October 1, 2017. (App. 002, Rizvan Decl., ¶ 7). The relevant change to that policy is that the "Expectations" for on-call employees changed from a "within 30 minutes" response time to an " at least 15 minutes" response time. (App. 009, Ex. A-3, On-call Policy (10-1-17) ¶ 3.2). Plaintiff claims that this change in the policy remedied the alleged FLSA violation. Doc. #2. Plf's Orig. Complaint at 1. In fact, the class only includes hourly employees who worked for Experian "who were subject to the 'On Call, Standby, and Call-Back Time' Policy that was in effect until approximately October 2017." Doc.# 24. Order at 8. Thus, the relevant time period for Plaintiffs' claims begin three years prior to the opt-in date for each Plaintiff and ends on October 1, 2017.

### C.  Plaintiff James Shelton's Employment with Experian.

Experian hired Plaintiff James Shelton ("Shelton") as a Junior Systems Administrator II on March 17, 2014. Shelton voluntarily resigned from his employment with Experian, and his last day of employment was October 15, 2015. (App. 012, Ex. A-4, Employment Info. For Shelton).

### D.  Plaintiff Rickey Wesley's Employment with Experian.

Experian hired Wesley as an Information Security Policy Management Specialist on May 5, 2014. (App. 014, Wesley Depo. at 16:8–16:16). From 2014 until 2019, while he was an hourly employee, Wesley was on the Cyber Security Engineering team. (App. 015-17, Wesley Depo. at

22:12–24:8). As an information security policy management specialist, Wesley was responsible for inputting, managing, and trouble-shooting the anti-virus software, McAfee, for the Company, as well as architecting new designs, new software, and new infrastructure. (App. 015-17, Wesley Depo. at 22:12–24:2).

From 2014 to 2017, Wesley was responsible for being on call after his regular work hours during the weekday and on weekends for any calls involving issues with McAfee Endpoint software. (App. 030-31, Wesley Depo. at 57:5–58:7). In order to respond to after-hour calls, Wesley needed to have his cell phone, access to the internet, and his company-issued laptop computer. (App. 022-23, Wesley Depo. at 46:3–46:7, 49:9–49:11). Employees in the Cyber Security Team were required to respond to on-call calls within 15 minutes. (App. 026-27, Wesley Depo. at 52:7–53:4). Wesley admits that he did not have to be at home to answer calls while on call; rather, if he was out at a restaurant eating, he could answer the call on his cell phone and log onto the computer in the car so long as he had internet. (App. 027-28, Wesley Depo. at 53:10–54:2). If Wesley was unable to answer the call within 15 minutes, the call would roll over to the other employee in Wesley's team; however, that employee was not competent in McAfee Endpoint, so he would not be able to assist with the issue. (App. 033-34, Wesley Depo. at 60:2–61:1). Wesley estimates that he would receive anywhere from zero to seven calls a week: "Sometimes it can be zero for the week, sometimes it can be one, sometimes it can be every day." (App. 034, Wesley Depo. at 61:2–61:13).

While on call, Wesley would answer calls from his house and his in-laws' house if he travelled; he would go to stores or restaurants that were within 15 minutes of his house so that he could get home and respond to a call. (App. 034-38, Wesley depo. at 61:14–65:24). Wesley testified that he could go for walks and bike-rides near his house, go to nearby restaurants, watch

television, read a book, barbecue on the back patio, cook, play board games or video games, visit with family, and sleep. (App. 039-43, Wesley Depo. at 66:7–66:16, 67:22–70:2). However, Wesley could not drink alcohol while he was on call. (App. 044, Wesley Depo. at 90:1–90:25).

Wesley admits that he entered all of his hours worked into Oracle, including time spent responding to calls while he was on call after his regularly scheduled work hours. (App. 024-25, 031-32, Wesley Depo. at 50:14–51:10, 58:8–59:5). Wesley was paid for all the working hours that he entered into his time records, and he was never disciplined for not responding to calls within a certain amount of time. (App. 020-21, 029, Wesley Depo. at 39:25–40:11, 55:16–55:24).

### E.  Plaintiff Francisco Lugo's Employment with Experian.

Franciso Lugo ("Lugo") worked for Experian from December 17, 2012 until April 26, 2019. (App. 048, Lugo Depo. at 12:5–12:6, 18:2–18:8). For the majority of his employment with Experian, Lugo was as a System Administrator in the Distributive Systems Group ("DSG"). (App. 050-52, Lugo Depo. at 21:25–23:20). As a System Administrator, Lugo was responsible for adding additional space to servers, troubleshooting hardware issues with machines, and assisting other groups that had issues with various applications or products. *Id.*

Lugo was required to be on call outside of his regular work hours during the weekday and on weekends for emergency calls. (App. 058-60, Lugo Depo. at 47:12 – 49:2). Lugo's team consisted of approximately 10 employees who were in an on-call rotation in which each employee would be on call one week as secondary and one week as primary. (App. 059-62, Lugo Depo. at 48:12 – 49:3, 57:3 – 58:8). Thus, Lugo would be on call for two weeks approximately every two months, and he would receive fewer calls while on secondary call than on primary. Employees in the DSG were required to respond to on-call calls within 15 minutes. (App. 058, Lugo Depo. at 47:7 – 47:11). Lugo typically received five to ten calls per week when he was primary and one or

two calls when he was secondary. (App. 064, Lugo Depo. at 60:8–60:23). The employees in the DSG were able to switch their on-call time with another employee if needed without supervisor approval. (App. 064-65, Lugo Depo. at 60:24 – 61:13). In order to respond to after-hour calls, Lugo needed to have his cell phone, access to the internet, and his company-issued laptop computer or his personal computer. (App. 067-68, Lugo Depo. at 66:10 – 67:20). In addition, throughout the relevant time period, Lugo had a personal hotspot for access to the internet anywhere, which he could use to answer calls if necessary. (App. 068-69, Lugo Depo. at 67:21–68:12).

Lugo testified that he would typically stay home while he was on call, or he would go to places that had the internet, like his family's house. (App. 070-71, Lugo Depo. at 69:10 – 70:19). Lugo admits that he would watch television and movies at home while he was on call; he could cook out, spend time with his children, sleep, mow the lawn, have people over to his house for a visit, read, and do chores around the house. (App. 072-76, Lugo Depo. at 71:5–75:11). As for other activities, Lugo testified that he did not ride his bike, go to the movies, walk his dog, or eat at restaurants while on call because he preferred not to; however, he was not prohibited from doing these things. (App. 076-80, Lugo Depo. at 76:24–78:9, 78:25–79:25).

Lugo admits that he was responsible for entering his hours worked into the Oracle timekeeping system, choosing regular time, overtime, double time, etc. (App. 053-54, Lugo Depo. at 28:15–28:20, 30:2–30:10). He admits that he always logged any time that he spent responding to calls while he was on call, and he was paid for that time. (App. 063-64 081-82, Lugo Depo. at 59:19–60:2, 80:5–81:1). Lugo was never disciplined or counseled by his supervisor for entering hours worked. (App. 056-57, 066, Lugo Depo. at 35:21–36:2, 63:11–63:15).

**F.  Plaintiff Ihor Nakonecznyj's Employment with Experian.**

Experian hired Nakonecznyj on September 30, 2015 as a Security Analyst in the Global Security Operations Center, and his employment was terminated in December of 2018. (App. 087-88, 122-23, Nakonecznyj Depo. at 15:17–16:4, 89:22–90:3). As a Security Analyst, Nakonecznyj was responsible for analyzing any incoming threats to the system, such as hackers. (App. 088-89, Nakonecznyj Depo. at 16:24 – 17:14).

Nakonecznyj entered his working hours in the Company's time keeping system weekly, and he would enter his hours as overtime when he worked over 40 hours in a week. (App. 090, 094-95, Nakonecznyj Depo. at 22:4–22:14, 36:6–37:14). As a Security Analyst, Nakonecznyj was required to be on call to respond to emergency issues after regularly scheduled work hours. He never had to return to work in order to answer an emergency call. (App. 097-98, Nakonecznyj Depo. at 43:17– 44:4). The security analysts would rotate being on call, so that one person would be the primary call at designated times; however, he does not recall how often he was on call during the relevant time. (App. 099-102, Nakonecznyj Depo. at 48:9 –51:25).

In order to respond to calls, Nakonecznyj was required to have his company-issued laptop, a cell phone, and access to the internet, which he had at his home. *Id*. While on call, Nakonecznyj logged any time that he spent responding to calls as overtime, and he was paid accordingly. However, he testified that he sometimes would not record the time if it was a short call (10–15 minutes) even though he was never instructed not to enter that time. (App. 103-104, Nakonecznyj Depo. at 53:16–54:17).

Because of his own security concerns, Nakonecznyj chose not to respond to calls while at a restaurant or in a public place, but he admits that there was no policy prohibiting it and he was

never instructed not to do so.[2] (App. 105-06, Nakonecznyj Depo. at 55:7–56:12). Despite the policy stating that on-call calls should be answered within 15 minutes, Nakonecznyj testified that he could not recall how quickly he was required to respond to calls when on call, but he stated that "three minutes comes to mind." (App. 105-06 113-15, Nakonecznyj Depo. at 57:17–58:20, 66:15–68:7). When asked how many on-call calls he received on average, Nakonecznyj responded, "I don't think I got very many," but he did recall that there were times when he received no calls at all. (App. 109, 120-21, Nakonecznyj. Depo. at 61:9–61:15, 82:13–83:21). Nakonecznyj was never counseled or disciplined for any of his time entries at Experian. (App. 091-93, Nakonecznyj Depo. at 29:12 – 29:14, 31:3 – 32:3).

Even though Nakonecznyj believed that he could not leave his house while he was on call, he admits that he was able to read books, visit with his wife, eat, and sleep while on call. He stated that he would not want to start a card game because it may get interrupted, and he was not interested in any other activities that he could do from home during his on-call periods. (App. 116-119, Nakonecznyj Depo. at 75:8–78:2).

### G. Plaintiff Jennifer Dodson's Employment with Experian.

Experian hired Dodson in December 2013 as a Database Administrator Senior ("DBA"), and she was promoted to Database Administrator Expert in 2016. (App. 129-30, Dodson Depo. at 16:13–17:6). Dodson was paid hourly until her promotion to DBA Expert in 2016. (App. 132, Dodson Depo. at 20:6–20:14). As a DBA, Dodson was responsible for supporting the databases' backup and recovery performance; she would work with application teams on issues, upgrades, and security projects. (App. 131, Dodson Depo. at 19:5–19:12).

---

[2] Despite his earlier testimony that he had to use his home internet for security purposes, Nakonecznyj admits that he could have a secure network using a Virtual Private Network ("VPN"), which he had with Experian. (App. 109-112, Nakonecznyj Depo. at 61:16–62:3, 63:9–64:21).

Dodson entered her hours worked into the Oracle time keeping system at the beginning of each week; she would enter 40 hours for the week if she knew she would be working that whole week. (App. 133-34, Dodson Depo. at 21:22–23:7). However, Dodson testified that she did not ever enter any overtime hours because she had an "understanding" that her team, Database Administrators, was not to enter overtime unless it was approved by a manager, and she believed that her managers did not have authority to approve overtime. (App. 135-137, Dodson Depo. at 23:8–25:12). Dodson testified that her coworker, Jason Yau, told her not to enter any overtime. Yau was not a supervisor for Experian, and Dodson never asked her supervisor whether that was the correct policy. (App. 139-40, Dodson Depo. at 29:25–31:12). Dodson stated that she believed that in one of the monthly meetings with the VP of Operations, "someone from Leadership said, there is no overtime," but she never asked anyone in Human Resources or any member of management about this policy (Apps. 141-43, 145-46, 36:20 – 38:24, 41:13–42:24). Dodson testified that she worked, on average, five hours of overtime each week. (App. 144, 154-55, Dodson Depo. at 39:7–39:21, 58:20–59:7).

Dodson was always on call throughout her employment with Experian because she was responsible for supporting other Experian employees on various application teams, and she was one of only two people who could work on the U.S. single sign-on systems.[3] (App. 151-55, Dodson Depo. at 51:8–55:5). In order to respond to after-hours calls, Dodson needed her Company-issued computer with the VPN connection, cell phone, and internet access, and Dodson had a personal hotspot that she could use for internet. (App. 156-57, Dodson Depo. at 60:10–61:15). Dodson is unsure of how many calls she received while on call, but she "frequently got called." (App. 158,

---

[3] Although there were two employees, they each worked on separate systems. So, they did not rotate on-call duties. (App. 154, Dodson Depo. at 58:1–58:13).

Dodson Depo. at 62:16–62:21). Dodson was required to respond to an on-call call within one hour. (App. 159, Dodson Depo. at 68:5–68:12). Dodson never kept any log of the time she spent responding to calls after hours. (App. 166, Dodson Depo. at 78:16–78:20).

Dodson testified that, while she was on call but not responding to calls, she was able to watch television at home, spend time with her daughter, go to church, work in her garden (albeit not as much as she liked), go out to dinner with her family, attend some of her daughter's school events, and walk her dogs. (App. 159-64, Dodson Depo. at 68:13–71:11, 72:9–73:14). Dodson never received any emergency calls while she was on vacation. (App. 165, Dodson Depo. at 76:22–76:25).

### H. Plaintiff Joseph O'Connor's Employment with Experian.

Experian hired O'Connor in February 2016 as a System Security Engineer. (App. 170-71, O'Connor Depo. at 12:5–12:10, 13:8–13:11). As a System Security Engineer, O'Connor was responsible for monitoring outbound traffic, meaning that he ensured that Experian employees could not go to prohibited sites on the internet, and he helped with connectivity issues. (App. 172, O'Connor Depo. at 14:2–14:21).

O'Connor admits that it was his responsibility to input all hours into the Oracle time keeping system, and he would typically enter those hours every two weeks. (App. 173-74, O'Connor Depo. at 18:2–19:22). However, O'Connor decided to stop entering the time that he spent answering calls while on call around August 2017, even though no one at Experian instructed him to do so. (App. 181-83, O'Connor Depo. at 42:13 – 44:13). At one point, O'Connor began entering his time spent on call as Standby Overtime, and he would log this for the entire time he was on call, regardless of whether he was answering a call. His supervisor, Jennifer Deckard, instructed him not to enter the time spent on call, and not responding to calls, as Standby time.

After this, O'Connor stopped logging any time that he spent on call, even if he was responding to a call. (App. 178-80, O'Connor Depo. at 37:19 – 39:25). He admits that this was a misunderstanding on his part. (App. 184-86, O'Connor Depo. at 52:19–54:1). In fact, even after he received explicit instructions from Deckard in November 2017, and again from HR in May of 2018, to log any time he spent responding to calls outside of regular business hours as overtime, O'Connor continued to not log his time because he disagreed with how he was supposed to be paid for that time. (App. 192-94, 200, O'Connor Depo. at 68:6–70:25, 80:5–80:17).

When O'Connor first began taking on-call duties, he was not in a set rotation; rather, his supervisor would ask him to be on call one night sporadically. (App. 176-77, O'Connor Depo. at 33:7–34:9). Once he entered the rotation, O'Connor would be the primary on-call employee for one week (seven days) every three to four weeks, and the schedule would rotate around where he was primary one week, secondary one week, and then tertiary one week. (App. 181-83, O'Connor Depo. 42:13–44:14). At one point, for a short time, O'Connor's team was instructed to respond to on-call calls within 8 minutes, but then it went back to a 15-minute response time like it had been previously. (App.186-87, O'Connor Depo. at 54:2–55:12).

In order to respond to call, O'Connor needed to have his Company-issued laptop, cell phone, and access to internet; he also had a personal hotspot to use for internet when he was away from his home. (App. 187-88, O'Connor Depo. at 55:13 – 56:10). O'Connor testified that if there was a time that he would not be able to take calls when he was scheduled to take calls, he could ask someone to cover him without management approval. (App. 189-90, O'Connor Depo. at 57:20–58:12). O'Connor estimates that he received between zero and two calls per week when he was on call. (App. 190-91, O'Connor Depo. at 58:22–59:3).

O'Connor testified that while he was on call, he was able to watch television, play and spend time with his children, cook, go for walks, attend church, travel, have friends and family visit the house, go grocery shopping, and go out to eat at restaurants. (App. 195-99, O'Connor Depo. at 71:15–73:10, 74:7–75:13). He felt like he was not able to go bike riding or play basketball while he was on call, but he admits that he could have brought his laptop with him in a backpack to do those activities. *Id*. He was not, however, able to go out on the lake or go camping while on call because the cell phone service was not reliable. (App. 197, O'Connor Depo. at 73:10–73:21).

## I.   Plaintiff Ryan Stephens's Employment with Experian.

Experian hired Stephens in 2000 to work in the Experian Global Operations Center ("EGOC"); he was promoted to Unix System Administrator after two years but was laid off in 2006. (App. 204-06, Stephens Depo. at 16:1–18:4). Experian rehired Stephens in 2010 in the EGOC with the intention to move him back to a Unix System Administrator when the position came open. He was then promoted to a Unix System Administrator in 2012. *Id*. Stephens is in a subsection of the Infrastructure Group called the Build Factory, and he is responsible for building servers. (App. 207-08, Stephens Depo. at 20:25–21:12).

Stephens enters his working hours into the Company's time keeping system, Oracle, every two weeks, entering all time for all two weeks at one sitting. (App. 209-11, Stephens Depo. at 24:13–26:23). If he worked overtime during a week, he would typically write it down on a piece of paper and enter that later. (App. 211-12, Stephens Depo. at 26:24–27:4). However, Stephens would not break down the overtime worked each day; instead, he would enter the total amount of overtime for the whole pay period as one lump sum on one day. (App. 213-16, Stephens Depo. at 35:22–36:17). Stephens understood that he was to log anytime he spent responding to calls while on call as regular or overtime hours, depending on how many hours he had worked that week.

(App. 219-21, Stephens Depo. at 57:24–59:5). Stephens testified that he entered and was paid for all the time he spent responding to calls when he was on call, except for the rare occasion that he would receive a call and answer the question in a few minutes. Those few times, Stephens chose not to log that time. (App. 215-17, Stephens Depo. at 37:16–38:21, 42:7–42:19).

Throughout the relevant period, Stephens was on an on-call rotation in his team, and he would be on call for two weeks (one week as primary and one week as secondary) every month and a half to two months, depending on how many employees were involved. (App. 222-24, Stephens Depo. at 62:2–64:17). Regardless of whether he was primary or secondary, Stephens would receive anywhere from zero to seven calls a week. (App. 225-26, Stephens Depo. at 69:13–70:7).

In order to respond to calls, Stephens needed his cell phone, his Company-issued computer, and access to the internet; Stephens also had a personal hotspot he could use to access the internet as well as a Company-provided PCMCIA card, which would allow access to the internet. (App. 227-28, 234-36, Stephens Depo. at 75:15–76:2, 86:15–88:5). Stephens did not have a required time in which he had to respond to calls while on-call. Early in his career, he could respond within 30 to 45 minutes, but later management talked to the group about needing to respond quicker to calls. (App. 229-33, Stephens Depo. at 80:16 – 84:22).

Stephens understood that he was to log anytime he spent responding to calls while on call as regular or overtime hours, depending on how many hours he had worked that week. (App. 219-21, Stephens Depo. at 57:24–59:5). Stephens was never disciplined or counseled about his response times while on call. (App. 237, Stephens Depo. at 90:12–90:17).

While he was on call after hours, Stephens was able to watch television, watch movies at home, surf the internet, watch YouTube videos, visit with friends, and go for walks in the

neighborhood.  (App. 238-42. Stephens Depo. at 93:18–94:4, 95:18–97:14). He admits that he was not prohibited from going out to eat or leaving the house; he just felt that he should not so that he could answer any calls quickly. (App. 239-40, Stephens Depo. at 94:5–95:17).

**J.    Plaintiff Kevin Phan's Employment with Experian.**

Experian hired Phan in the Graduate Rotation on or around September of 2013, in which Phan was trained in several different departments. (App. 246-47, Phan Depo. at 11:16–12:8). Phan was promoted to a Windows Administrator in DSG. (App. 247-48, Phan Depo. at 12:17–13:17). As a Windows Administrator, Phan is responsible for building servers for clients, as well as responding to requests, such as adding a hard drive, changing something on the server, and troubleshooting issues with the servers. (App. 249-50, Phan Depo. at 16:11–17:5).

When Phan began his career at Experian, his supervisor, Tammy Braun, instructed him on how to keep track of his working hours and how to input those hours into Experian's timekeeping system, Oracle. (App. 252-53, Phan Depo. at 19:19–20:15). Phan would enter his time into Oracle every two weeks, entering a total of eight hours every day and entering anytime over eight hours each day as overtime. (App. 250-51, Phan Depo. at 17:19–18:21). Phan admits that he entered all the time he spent responding to on-call calls as regular time or overtime and that he was paid for all of that time, Phan testified that he was never asked to delete his entries for overtime. (App. 254-55, Phan Depo. at 23:2–23:23, 24:17–24:19, 43:23–45:20).

As a Windows Administrator, Phan was responsible for being on call outside of his regular work schedule. In the DSG team, Phan was on call approximately two weeks every two months, depending on how many employees were in the rotation. (App. 257, Phan Depo. at 34:8–34:24). There were approximately 10 people on Phan's team in the on-call rotation. (App. 262-63, Phan Depo. at 42:15–43:1). Phan estimates that he received approximately 14 calls per week when he

was the primary on-call contact.[4] (App. 258-59, Phan Depo. at 35:15–36:15). If Phan wanted to switch or swap his on-call week, he could find another employee to switch weeks without manager approval. (App. 258, Phan Depo. at 35:1–35:14).

In order to respond to calls, Phan needed his cell phone, his Company-issued computer, and access to the internet; he would log into the system via a VPN, which created a secure network regardless of what internet he was utilizing. (App. 261, 263, Phan Depo. at 41:15 – 41:24, 43:7–43:15). Phan testified that Experian provided an internet card, but he preferred not to use it because it was slow. (App. 262, Phan Depo. at 42:3–42:11). When he received a call while on call, Phan was contacted on his cell phone via call and text, as well as sent an email to his work email, and he had to respond within 10 to 15 minutes before he would either be contacted again or the call would roll to the secondary contact. (App. 259-60, Phan Depo. at 36:16–37:7). Phan could remedy most of the calls remotely, but occasionally the call would involve the physical server located in McKinney, Texas. If Phan was required to go to the McKinney location, he would let the Operations Center know how long it would take him to get there. There was no required time for him to arrive at that location. (App. 266-67, Phan Depo. at 47:7–48:20).

While Phan was on call, but not responding to calls, he could sleep, watch television, go out to eat at fast-food restaurants, read books, go for walks, eat dinner with his wife, spend time with his wife, go shopping at nearby stores, have friends over to visit, and play his guitar and piano. (App. 268-75, Phan Depo. at 49:20–56:7). Phan would choose not to engage in some of these activities while on call, but he was not prohibited to do so. *Id*.

---

[4] Phan testified that, at one point, the on-call rotation changed such that the primary and secondary contact would be primary during the day one week and primary during the nights the next. However, this did not change the number of calls he received per week. (App. 276-79, Phan Depo. at 57:10–60:19).

### K.  **David Dell's Employment with Experian.**

Experian hired Dell in late February of 2016 as a Systems Administrator Senior (App. 288-89, 288-89, Dell Depo. at 17:6–18:13). As a Systems Administrator Senior, Dell was responsible for keeping the servers healthy and operational, including vulnerability management and patching. *Id*. Dell admits that he logged all of his working hours (time spent on Company-related tasks), including regular and overtime hours, into the Company's timekeeping system, Oracle. (App. 290-94, Dell Depo. at 25:15 – 29:13).

Dell began taking on-call duties around July or August of 2016. (App. 301, Dell Depo. at 41:5–41:8). There were rare occasions that Dell would have to go the Company's facility in McKinney, Texas when he would receive a call after hours that required to service the physical server. However, he did not have a required time in which he had to get there. (App. 297-99, Dell Depo. at 36:23–38:23). Because of this, Dell was required to stay in the area while on call so that he could report to the physical server if needed. (App. 308-09, Dell Depo. at 53:6–54:12).  In Dell's team, the employees rotated weeks being on call; Dell would be on call approximately two weeks (one week primary, one week secondary) every two months. (App. 301-02, Dell Depo. at 41:9–42:13). Dell estimated that he received approximately three or four calls per week when he was primary and one or two calls per week when he was secondary. (App. 302, Dell Depo. at 42:14–42:25). The length of the calls varied depending on the issue needing to be resolved. *Id*. Dell was able to switch his on-call weeks with other individuals on his team if he could find someone willing to switch, and no management approval was needed to make these changes. (App. 303-04, Dell Depo. at 45:15–46:5).

In order to respond to calls when on call, Dell needed his cell phone, his Company-issued computer, and access to the internet. (App. 309-10, Dell Depo. at 54:16–55:13). Dell testified that

his required response time for calls was unclear, but there was an understanding that the response time was determined by the importance of the call: Priority 2: 10 – 15 minutes, Priority 1: 5 – 10 minutes, and Sev. C (Severity Critical): immediately to 1 minute. (App. 305-06, Dell Depo. at 50:14–51:7). Dell was never counseled or disciplined for not responding to a call within a certain amount of time. (App. 307-08, Dell Depo. at 52:16–53:5).

While he was on call, Dell was able to go out to eat at restaurants, sleep, eat, cook, barbecue, play certain video games, attend church online, watch television, watch movies, read, visit friends at their homes or his, go grocery shopping nearby, and go for walks. (App. 311-16, Dell Depo. at 57:2–62:12).

## V.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248).

The Fifth Circuit held that where the relevant basic facts of what activities an employee may engage in while on call are undisputed, the question of whether an employee was able to use the time for his own purposes may be resolved by courts as a matter of law on summary judgment. *Bright v. Hous. Nw. Med. Ctr., Inc.*, 934 F.2d 671, 675 (5th Cir. 1991). In FLSA collective action

cases, courts routinely decide summary judgment questions for the entire class based on representative discovery evidence. *Senegal v. Fairfield Indus.*, No. H-16-2113, 2018 U.S. Dist. LEXIS 198209, at \*21 (S.D. Tex. Nov. 21, 2018) (granting Defendant's motion for summary judgment on the compensable hours issue as to specific activities based on representative discovery evidence); *Nelson v. Am. Standard, Inc.*, No. 2:07-CV-10-TJW-CE, 2009 U.S. Dist. LEXIS 113448, at \*9–10 (E.D. Tex. Dec. 4, 2009). ("If the discovery shows defenses and differences for these individuals, Defendant [] will be able to make its case for decertification or summary judgment**."**)**.**

## VI.   ARGUMENT AND AUTHORITIES

Because there are no genuine issues of material fact and the law supports Experian's Motion, all Plaintiffs' claims (Representative and Opt-in) must be dismissed as a matter of law.

### A. **Plaintiff James Shelton's Claim Is Time-Barred and Should Be Dismissed.**

An action under the FLSA must commence within two years after the cause of action accrued. 29 U.S.C. § 255. However, if the violation is "willful," the cause of action must be commenced within three years after it accrued. *Id*. "Willful" means "that the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the statute*." McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 128 (1988). A cause of action "begins to accrue at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 272 (5th Cir. 1987), *modified on other grounds*, 826 F.2d 2 (5th Cir. 1987); *see also Hendrix v. Yazoo City*, 911 F.2d 1102 (5th Cir. 1990) (holding that the cause of action begins to run on date employer makes unlawful payment).

Plaintiff Shelton filed his notice of consent to opt into the lawsuit on November 13, 2018. *See* Doc. 31, Shelton Notice of Consent. Thus, Shelton can only bring claims for alleged unpaid overtime occurring after November 13, 2015. Because Shelton was not employed by Experian after October 14, 2015, his claim is time-barred and should be dismissed in its entirety. (App. 002, Rizvan Decl. at ¶ 9).

**B.   Plaintiffs' Time Spent On-Call is Not Compensable.**

The deposition testimony of the Representative Plaintiffs establishes that Experian did not violate the FLSA because employees were able to use their time for their own activities while they were on call after regular work hours.  For all the reasons stated above and explained below, Wesley's collective action claims cannot survive summary judgment.

An employer must pay an employee at a rate of one and one-half times the normal rate of pay for all time worked beyond 40 hours in a work week.  29 U.S.C. § 207(a)(1). An employee's time is "work" for the purposes of the FLSA if it is spent "predominantly for the benefit of the employer." *Armour & Co. v. Wantock,* 323 U.S. 126, 133 (1944).  In deciding if an employee was "working" under the FLSA, courts use a "practical approach based on the realities of each case." *Armour*, 323 U.S. at 133.

Under 29 C.F.R. § 785.17, an on-call employee who is not required to remain on the employer's premises, but is only required to notify the employer where he may be reached, is not working while on call.  According to Department of Labor guidance, this time is not compensable so long as the employee is free to engage in personal activities when he or she is on call.  United States Dep't of Labor, Wage & Hour Div., Opinion Letters – Fair Labor Standards Act, No. FLSA2008-14NA, 2008 DOLWH LEXIS 38 (Dec. 18, 2008).

Time spent while on call is not compensable unless the activities of the employee are so restricted as to prevent the employee from using the time effectively for personal pursuits. *Halferty v. Pulse Drug Co., Inc.*, 864 F.2d 1185, 1189 (5th Cir. 1989); *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369, 373–74 (5th Cir. 1987); *see also* 29 C.F.R. § 785.17.  Significantly, "this does not imply that the employee must have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, . . . ." *Bright*, 934 F.2d at 677. Generally, employees with the freedom to sleep, eat, watch television, entertain guests, and leave their home are not entitled to on-call compensation. *See*, *e.g.*, *Halferty*, 864 F.2d at 1190 (internal citations omitted); *Mem'l Hospice, Inc. v. Norris*, No. 2:08-CV-48-B-A, 2009 U.S. Dist. LEXIS 13899, at *10-11 (N.D. Miss. Feb. 24, 2009). For example, in *Bright*, a repair technician was on call for a hospital 24 hours per day, every day. 934 F.2d at 677. The technician was required to refrain from alcohol consumption, wear a pager at all times, and report to the workplace within twenty minutes of receiving a call, and he received an average of four to five calls per week. *Id*. The Fifth Circuit held that the on-call time was not compensable because the technician was free to do as he pleased at all times except when he received a call, and the frequency of the calls did not prevent him from using the on-call time for personal purposes.  *Id*.

This Court described the test under the FLSA as the "personal pursuits" test because the Fifth Circuit has held that the critical issue in determining whether "waiting time" is compensable under the FLSA as "working time" is "whether the employee can use the [on-call] time for his ... own purposes.'" *Driscoll v. Fannin Cty.,* No. 4:12CV24, 2013 U.S. Dist. LEXIS 23181, at *7 (E.D. Tex. Jan. 4, 2013) (Mazzant, J.) (quoting *Paniagua v. City of Galveston, Tex.*, 995 F.2d 1310, 1316-17 (5th Cir. 1993)).

Several factors are relevant to determine if an employee's on-call time constitutes "work" under the FLSA: "(1) whether the employee is restricted to some fixed place designated by his employer; or may move between various locations such as his own home, friends' homes, churches, restaurants, or gyms; (2) what activities the employee may engage in, such as eating, sleeping, drinking alcohol, exercising, watching television, doing laundry, or playing cards or other games; (3) the response time or maximum distance radius from the place of business imposed on the employee; (4) whether employees can make arrangements to trade on-call shifts among themselves or request their employer to reassign an on-call shift to another employee; and (5) the frequency with which employees must respond to a call. *Sims v. Hous. Auth. of the City of El Paso*, No. EP-10-CV-109-KC, 2011 U.S. Dist. LEXIS 98809, at *9 (W.D. Tex. Sept. 1, 2011) (citing *Bright*, 934 F.2d at 677-78); *Paniagua*, 995 F.2d at 1317; *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369, 373-74 (5th Cir. 1987). *See also* United States Dep't of Labor, Wage & Hour Div., Opinion Letters – Fair Labor Standards Act, No. FLSA2008-14NA, 2008 DOLWH LEXIS 38 (Dec. 18, 2008) (noting factors considered by federal courts and collecting cases).

## 1.   Location and Response-Time Restrictions.

Courts evaluate location restrictions by analyzing the relationship between the location and time requirements and the particular location and demands of the employer. Courts have held that on-call time is not compensable under the FLSA even where the employer required the employee to remain at home or on the employer's premises. *Halferty v. Pulse Drug Co.*, 864 F.2d 1185, 1189 (5th Cir. 1989) (finding that an ambulance dispatcher, who was required to stay home from 5:00 p.m. until 8:00 a.m. five nights a week, was not entitled to overtime compensation under the FLSA); *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 738-39 (6th Cir. 2000) (holding that employee's time at home when he was not answering calls was not compensable when he was on

call daily from 5:00 p.m. to 8:00 a.m. and occasionally from 5:00 p.m. Friday until 8:00 a.m. Monday and when he was expected to remain at home while on call and required to answer the employer's calls forwarded to his house); *Kelly v. Hines-Rinaldi Funeral Home, Inc.*, 847 F.2d 147, 148 (4th Cir. 1988) (holding that a funeral home employee was not entitled to overtime compensation despite the employer's requirement that the employee stay in his residence on premises of the funeral home from 12:00 a.m. to 6:30 a.m.). The Fifth Circuit upheld the district court's dismissal of oil-derrick-barge employees' wage claims who were required to stay on the barge while off duty but subject to being called to work. *Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245, 1248-49 (5th Cir. 1986).

 In the present case, the Plaintiffs were not typically required to return to Experian's facility to respond to calls while on-call. Because of the nature of the work, the Plaintiffs were able to respond to calls at any location: at their home, at friends' or families' homes, at a coffee shop. Most Plaintiffs testified that they only needed a cell phone, his or her work computer, and access to the internet. (App. 022-23, 54-55, Wesley Depo. at 46:3–46:7, 49:9– 49:11, Dodson Depo. at 60:10 – 61:15). Only Plaintiff Nakonecznyj testified that he felt he needed to remain at home while on call, but he admitted that this was his personal preference, and he was not instructed to do so by any Experian management. (App. 105-06, Nakonecznyj Depo. at 55:7–56:12). However, those employees who responded to issues related to the physical server in McKinney, Texas would need to travel to that facility on rare occasions, and this required them to stay nearby. (App. 266-67, 308-09, Dell Depo. at 53:6–54:12; Phan Depo. at 47:7–48:20). Nevertheless, these employees were not required to make it to the McKinney facility in any specified amount of time. *Id*.

 Plaintiffs' required response times varied depending on the team and supervisor in charge of the individual's on-call system. Some were required to accept or respond to the call within 15

minutes before it would roll to the next person in line. (App. 026-27, 058, 186-87, 259-60, Wesley Depo. at 52:7–53:4; Lugo Depo. at 47:7–47:11; O'Connor Depo. at 54:2–55:12; Phan Depo. at 36:16–37:7). Although Nakonecznyj could not recall, he thought his response time might have been three minutes. (App. 107-08 112-15, Nakonecznyj Depo. at 57:17–58:20, 66:15–68:7). Stephens did not have a required time in which to respond, but depending on the time frame, it was anywhere from 30-45 minutes to an indeterminate shorter time. (App. 229-33, Stephens Depo. at 80:16 – 84:22). Dodson testified that her team had a one-hour rule to respond to calls. (App. 157, Dodson Depo. at 68:5–68:12). Dell's response times depended on the nature and severity of the calls. (App. 305-06, Dell Depo. at 50:14–51:7).

## 2. Activities in Which Plaintiffs Could Engage.

When on-call employees are able to engage in activities for their own pursuits, their time is not compensable under the FLSA. *Bright,* 934 F.2d at 677; *Halferty*, 864 F.2d 1185; *Brock*, 826 F.2d at 373–74; *Driscoll,* Dist. LEXIS 23181, at *7 (Mazzant, J.). However, "[t]his does not imply that the employee must have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time." *Bright*, 934 F.2d at 677. For example, in *Rousseau*, the barge employees who were not allowed to leave the barge during their off-duty time were able to engage in several activities in the living quarters, such as sleeping, eating, watching television and VCR movies, playing cards and ping pong, reading, listening to music. *Rousseau*, 805 F.2d at 1248. Because of this, the *Rousseau* Court held that the hours spent off-duty were not compensable because the barge employees were able to use that time for their own pursuits, even though they could not leave the barge. *Id*.

Here, although two Plaintiffs testified that they had a personal policy of not leaving the house during their on-call weeks, all of the Plaintiffs testified they were able to engage in numerous activities at their home while they were on call (while not responding to calls):

- Wesley would travel to his in-laws' house and go to stores or restaurants that were within 15 minutes of his house. (App. 034-38, Wesley depo. at 61:14–65:24). Wesley also testified that he could go for walks and bike-rides near his house, go to nearby restaurants, watch television, read a book, barbecue on the back patio, cook, play board games or video games, visit with family, and sleep while on call. (App. 039-43, Wesley Depo. at 66:7–66:16, 67:22–70:2).

- Dodson could watch television at home, spend time with her daughter, go to church, work in her garden, go out to dinner with her family, attend some of her daughter's school events, and walk her dogs. (App. 157-62, Dodson Depo. at 68:13–71:11, 72:9–73:14).

- O'Connor was able to watch television, play and spend time with his children, cook, go for walks, attend church, travel, have friends and family visit the house, go grocery shopping, and go out to eat at restaurants. (App. 195-99, O'Connor Depo. at 71:15 – 73:10, 74:7–75:13).

- Phan could sleep, watch television, go out to eat at fast-food restaurants, read books, go for walks, eat dinner with his wife, spend time with his wife, go shopping at nearby stores, have friends over to visit, and play his guitar and piano. (App. 268-76, Phan Depo. at 49:20–56:7).

- Dell was able to go out to eat at restaurants, sleep, eat, cook, barbecue, play certain video games, attend church online, watch television, watch movies, read, visit

friends at their homes or his, go grocery shopping nearby, and go for walks. (App. 311-16, Dell Depo. at 57:2–62:12).

Even the Plaintiffs who did not feel comfortable leaving their homes during their on-call weeks stated that they were able to engage in personal activities while on call. For example, Nakonecznyj admitted that he was able to read books, visit with his wife, eat, and sleep while he was on call. (App. 116-19, Nakonecznyj Depo. at 75:8–78:2). Lugo admitted that he would watch television and movies at home while he was on call; he could cook out, spend time with his children, sleep, mow the lawn, have people over to his house for a visit, read, and do chores around the house. (App. 072-76, Lugo Depo. at 71:5–75:11). Stephens was able to watch television, watch movies at home, surf the internet, watch YouTube videos, visit with friends, and go for walks in the neighborhood. (App. 238-42. Stephens Depo. at 93:18–94:4, 95:18–97:14).

### 3. Flexibility in Scheduling.

Courts also consider the ability of the employee to trade shifts with co-workers in determining whether on-call time is compensable. *See Brock*, 826 F.2d at 373; *Sims*, 2011 U.S. Dist. LEXIS 98809, at *13. For example, in *Sims*, the maintenance employees were able to switch a day or week of on-call time if needed. *Sims*, 2011 U.S. Dist. LEXIS 98809, at *13. The Western District of Texas held that this afforded the maintenance plaintiffs "great flexibility in scheduling on-call time," which weighed in favor against finding the on-call time to be compensable. *Id*. Here, with the exception of Dodson and Wesley, the Plaintiffs testified that they were able to swap their on-call time without first getting management approval if needed. (App. 064-65, 189-90, Lugo Depo. at 60:24 – 61:13, O'Connor Depo. at 57:20–58:12). Because many of the Plaintiffs were on a rotation with other employees, they were able to swap schedules or have the secondary on-call employee cover for them if they were going to be unexpectedly unavailable. (Apps. 064-65, 189-

90, 258, Phan Depo. at 35:1–35:14, Lugo Depo. at 60:24–61:13, O'Connor Depo. at 57:20–58:12).

O'Connor testified that if there were a time that he would not be able to take calls when he was

scheduled to take calls, he could ask someone to cover him without management approval. (App.

189-90, O'Connor Depo. at 57:20–58:12).

### 4. Frequency of Calls.

Courts consider the frequency of calls when determining whether an on-call employee is

free to use his time for personal pursuits. *Bright*, 934 F.2d at 677. Typically, if the individual is

getting calls every few minutes of the day, it cannot be said that he is able to use his time for his

own personal pursuits. *Id*. In *Bright*, the Fifth Circuit held that the on-call time was not

compensable because the technician was free to do as he pleased at all times except when he

received a call, and the frequency of the calls—four to five a week—did not prevent him from

using the on-call time for personal purposes.  *Id*.

Here, several Plaintiffs testified that they sometimes received no calls or very few calls

during their on-call weeks. Nakonecznyj stated, "I don't think I got very many," and he recalled

that there were times when he received no calls at all. (App. 109, 120-21, Nakonecznyj. Depo. at

61:9–61:15, 82:13–83:22). Wesley testified that "[s]ometimes it can be zero for the week,

sometimes it can be one, sometimes it can be every day." (App. 034, Wesley Depo. at 61:2–61:13).

Lugo typically received five to ten calls per week when he was primary and one or two calls when

he was secondary. (App. 064, Lugo Depo. at 60:8–60:23). Dodson could not estimate the number

of calls she received while on call, but she "frequently got called." (App. 156, Dodson Depo. at

62:16–62:21). O'Connor estimated that he received between zero and two calls per week when he

was on call. (App. 190-91, O'Connor Depo. at 58:22–59:3). Regardless of whether he was primary

or secondary, Stephens would receive anywhere from zero to seven calls a week. (App. 225-26,

Stephens Depo. at 69:13–70:7). Phan received approximately 14 calls per week when he was the primary on-call contact. (App. 258-59, Phan Depo. at 35:15–36:15). Dell estimated that he received approximately three or four calls per week when he was primary and one or two calls per week when he was secondary. (App. 302, Dell Depo. at 42:14–42:25).

Based on the Representative Plaintiffs' testimony, which is undisputed for purposes of this Motion, their time spent on call while not responding to calls is not compensable time under the FLSA because they were all able to use their time for their own personal pursuits, rather than for Experian's benefit. All employees who entered their time spent responding to calls were paid for that time per Experian's policy and the FLSA. Therefore, Plaintiffs' claims for time spent on call and not responding to calls should be dismissed in their entirety.

### C. Any Claim for Time that Plaintiffs Dodson and O'Connor Did Not Record Should Be Dismissed.

To the extent that Plaintiff's Complaint might allege a claim that Plaintiffs were not paid for time spent responding to calls, those claims should be dismissed because the two Plaintiffs who allege they worked overtime and did not record it did so at their own choosing, and not because Experian required it.[5]   In fact, Experian's policy explicitly states that it is the employee's responsibility to accurately and completely record their hours worked. (App. 005, Ex. A-1, Pay Policies at ¶ 3.9). While Plaintiffs were always compensated for the time spent working on call

---

[5] Plaintiff's Complaint is unclear as to whether he is alleging only or also that Plaintiffs were not paid for time spent responding to calls while on call. Most all of the Representative Plaintiffs testified that they were only seeking payment for time in which they were available to receive a call while on call and that they had already been paid for all time they recorded. (App. 024-025, 031-32, 063-64, 081-82, 103-04, 215-17, 287 Wesley Depo. at 50:14–51:10, 58:8–59:5, Lugo Depo. at 59:19–60:2, 80:6–81:1, Nakonecznyj Depo. at 53:16–54:17, Stephens Depo. at 37:16–38:21, 42:7–42:19, Phan Depo. at 23:2–23:23, 24:17–24:19, 43:23–45:20, Dell Depo. at 11:2-16). Although it is unclear whether these claims are alleged in Plaintiff's Complaint, Experian addresses them here, and asks the Court to dismiss these claims as well.

that they recorded, some Plaintiffs *personally* chose not to record time spent while actually working on call. (Apps. 135-37, 178-79, Dodson Depo. at 23:8–25:12, O'Connor Depo. at 37:19–39:25). The Company had no knowledge of the practice of these employees, and it could not have known because the managers relied on the employees' record of their own time. *See Newton v. City of Henderson*, 47 F.3d 746, 749-50 (5th Cir. 1995) (reasonable for remote employee's supervisor to rely on employees' payroll submissions as a reliable indicator of the number of hours being worked). Moreover, Dodson and O'Connor both testified that their failure to record all time spent on calls was due to personal misunderstandings and that they were never instructed by their respective managers to not enter time spent working. (App. 138-40, 141-43,145-46, 184-86 Dodson Depo. at 29:25–31:12; 36:20 – 38:24, 41:13–42:24, O'Connor Depo. at 52:19–54:1; 68:6–70:25, 80:5–80:17). In fact, O'Connor admitted that it is his responsibility to input all hours worked into the Oracle time keeping system. (App. 173-74, O'Connor Depo. at 18:2–19:22).

Despite Experian's express policy to record all hours worked, Plaintiffs Dodson and O'Connor failed to record the time they spent responding to calls after hours. Experian had no knowledge of this time, and neither Dodson nor O'Connor were instructed by Experian not to record that time. For these reasons, any claims for unrecorded time should be dismissed.

## VII.   CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Experian respectfully requests this Court grant summary judgment in favor of Experian on all of Plaintiffs' claims and for such further relief as the Court deems just and proper.

Dated:  October 23, 2020                         Respectfully submitted,

By:  */s/ Paul E. Hash*
Paul E. Hash
State Bar No. 09198020
Paul.Hash@jacksonlewis.com
Wendy Wilkins, Esq.
Texas Bar No. 24095715
Wendy.Wilkins@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas  75201
PH:  (214) 520-2400
FX:  (214) 520-2008

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

On October 23, 2020, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served all counsel of record electronically, as authorized by Federal Rule of Civil Procedure 5(b)(2), including the following:

J. Forester
Meredith Mathews
Forester Haynie PLLC
400 North St. Paul St., Suite 700
Dallas, TX 75201

Jill J. Weinberg
Weinberg Law Firm, PLLC
6425 Willow Creek Drive
Plano, TX 75093

*/s/ Paul E. Hash*
Paul E. Hash